mr

RECEIVED
2014 JAN -9 AM 9:56
U.S. COURT OF APPEALS
FOURTH CIRCUIT

IN THE UNITED STATES COURT OF APPEALS

4th CIRCUIT OF VIRGINIA

| | | |
|---|---|---|
| Judson Witham | ) | |
| Re: The Clifford and Anita Witham Family | ) | Case No. 13-2482 |
| Appellant | ) | |
| vs. | ) | Witham Appeal |
| New York State, | ) | |
| Department of Environmental | ) | |
| Conservation , International Paper Corporation | ) | **Oral Argument Requested** |
| Warren County New York , | ) | |
| The Lake George Park Commission, | ) | |
| Town Of Ticonderoga, NY | ) | Jury Trial Is Demanded |
| Defendants | ) | |

I.

Appellant's Brief

Oral Argument Requested

1. In This Case The MATERIAL and RELEVANT facts well pled ( FRCP 8 ) by Plaintiff were horrendously mischaracterized, Interpretively Butchered and the specifics Ignored by the District Court sitting in Raleigh. The District Court so butchered and mischaracterized Appellant's Facts they erroneously made many errors including stating "Chunks of Ice" were being dumped into Lake George. Liberal Reading and Interpretation of the FACTS as Alleged are REQUIRED not only by the Pro Se Rules but as well by Decent and Moral Conduct of Men. For Instance See the Pope's Stripping of Immunity From the Vatican and Catholic Church http://www.vatican.va/holy_father/francesco/motu_proprio/documents/papa-francesco-motu-proprio_20130711_organi-giudiziari_en.html

2. The disparaging nature of the District Court's Negative Connotations associated with the District Court's claims that Appellant's pleadings are " Rambling " is an intentional disparaging and very insulting characterization of the pleadings . Then the District Court's blatant disregard and insulting claims the pleadings are mostly "Irrelevant" reveal the Sophistries being employed of the District COURT to STRIP this Plaintiff of very significant Property and Due Process / Equal Protection rights. See .... John Dioguardi, an immigrant and pro se plaintiff, .... His home-drawn complaint alleged in broken English a number of factual circumstances but failed to make any coherent legal presentation. Judge Charles E. Clark, the principal draftsman of the Federal Rules, wrote for the Second Circuit in overturning the district court's Rule 12(b)(6) dismissal of Dioguardi's action.17 The court found enough information within the complaint's allegations to satisfy Rule 8(a)(2)'s pleading standard. Judge Clark's opinion reminded the profession that Rule 8 required only "a short and plain statement of the claim showing that the pleader is entitled to relief" and no longer demanded "facts sufficient to constitute a cause of action," as was required under code pleading. Judge Clark's lecture on the new pleading standard was confirmed thirteen years later by the Supreme Court's ruling in Conley v. Gibson, in which it famously stated, "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim . . . ." Dioguardi v. Durning, 139 F.2d 774 (2d Cir. 1944). See generally 5 WRIGHT & MILLER, § 1220 (showing how Dioguardi is illustrative of the pleading philosophy created by the Federal Rules of Civil Procedure). see also Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970) (holding that it was error to grant summary judgment because the respondent did not meet its "burden of showing the absence of a genuine issue as to any material fact").

3. The District Court's Sophistries and Mis-Treatment of Plaintiff's Rule 8 Pleadings Is Overtly Stripping Your Appellatnt's Right to a Jury Trial. Appellant Never Mentioned anything regarding " Chunks of Ice being Dumped anywhere"

*Note To US Government ..... Place more than 40 Square Miles of 18 inch think Lake Ice on the roof of any Federal Court House and that Court House Would Be CRUSHED Flat and Destroyed. Maybe 100s of Millions of Tons of Lake Ice Placed on the Raleigh Federal Court House would be a good way to Alert The Lower Court to the Seriousness of Appellant's Well Pled Facts that are more than sufficient and Allowed by FRCP 8. Again Appellant never mentioned CHUNKS of Ice Being Dumped into Lake George ..... Maybe The Lower Court Thinks Slipshod Innaccurate and Slothful recitation and CHANGING the Facts of a Case is a good way to CHEAT and STRIP Litigants as done in This Case Is Funny ....*

*Appellant Does NOT* <--- <<<

II.

Pro Se Precedent Case Law Mandates

1. Liberal Reading and Treatment of Pro Se Petitions Accuracy and Truthfulness Is REQUIRED not elective. The Court below was unable to recite the Facts pled accurately because of their Slothful and Inarticulate, Case Dumping and Court Stripping of Your Appellant's Jury Trial Rights.

2. Haines v. Kerner, 404 U.S. 520 (1971) Plaintiff-inmate filed pro se complaint against prison seeking compensation for damages sustained while placed in solitary confinement. In finding plaintiff's complaint legally sufficient, Supreme Court found that pro se pleadings should be held to "less stringent standards" than those drafted by attorneys.

3. Elmore v. McCammon (1986) 640 F. Supp. 905 "... the right to file a lawsuit pro se is one of the most important rights under the constitution and laws."

4. Jenkins v. McKeithen, 395 U.S. 411, 421 (1959); Picking v. Pennsylvania R. Co., 151 Fed 2nd 240; Pucket v. Cox, 456 2nd 233 Pro se pleadings are to be considered without regard to technicality; pro se litigants' pleadings are not to be held to the same high standards of perfection as lawyers.

5. Maty v. Grasselli Chemical Co., 303 U.S. 197 (1938) "Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should not raise barriers which prevent the achievement of that end. Proper pleading is important, but its importance consists in its effectiveness as a means to accomplish the end of a just judgment." NOT TO STRIP AMERICANS OF THEIR JURY TRIAL RIGHTS

6. Puckett v. Cox, 456 F. 2d 233 (1972) (6th Cir. USCA) It was held that a pro se complaint requires a less stringent reading than one drafted by a lawyer per Justice Black in Conley v. Gibson (see case listed above, Pro Se Rights Section).

7. Picking v. Pennsylvania Railway, 151 F.2d. 240, Third Circuit Court of Appeals

The plaintiff's civil rights pleading was 150 pages and described by a federal judge as "inept". Nevertheless, it was held "Where a plaintiff pleads pro se in a suit for protection of civil rights, the Court should endeavor to construe Plaintiff's Pleadings without regard to technicalities."

8. Puckett v. Cox, 456 F. 2d 233 (1972) (6th Cir. USCA) It was held that a pro se complaint requires a less stringent reading than one drafted by a lawyer per Justice Black in Conley v. Gibson (see case listed above, Pro Se Rights Section). Roadway Express v. Pipe, 447 U.S. 752 at 757 (1982) "Due to sloth, inattention or desire to seize tactical advantage, lawyers have long engaged in dilatory practices... the glacial pace of much litigation breeds frustration with the Federal Courts and ultimately, disrespect for the law."

9. Sherar v. Cullen, 481 F. 2d 946 (1973) "There can be no sanction or penalty imposed upon one because of his exercise of Constitutional Rights."

10. Schware v. Board of Examiners, United State Reports 353 U.S. pages 238, 239. "The practice of law cannot be licensed by any state / State."

11. Sims v. Aherns, 271 SW 720 (1925) "The practice of law is an occupation of common right."

12. The Court Below employed insulting, MOCKING and deception, diversion sophistry and distraction by intentionally insulting Plaintiff's well pled case. Disparaging the Appellant and His Facts Pled and Butchering the interpretation Facts Alleged The Aim was to RUBBER STAMP A DISMISSAL. It is abundantly obvious that the pleadings were never treated fairly or in accordance with the rules. The simplest of Facts Pled were wholly and absurdly, inaccurately characterized by the District Court revealing they BUTCHERED and intentionally abandoned their duty to thoroughly and carefully consider the facts well pled per Rule 8 of the FRCP , the Notice Pleading Standards. Court Stripping Jury Trial Rights is OBSCENELY UnAmerican and Very Very Unlawful and Unconstitutional.

III.

Ashcroft Plausible Standard UnAmerican , Unconstitutional

1. The Very New and Recently recognized ASHCROFT Plausible Standards and such Diversionary Standards as " Minimum Contacts " rules cited with the Ashcroft vs Iqbal 129 S.Ct. 1937, 1949 (2009 ) and Bell Atl. Corp v. Twombley 550 U.S. 544, 570 ( 2007 ) and then the So Called Minimum Contacts Sophistry of Int'l Co. v. Washington, 326 U.S. 310, 316 ( 1945 ) are wholly and patently Unconstitutional. Facts are for Juries to decide. The Ashcroft Standard is abusive COURT STRIPPING Mechanism and Sophistry NEWLY Recognized but Horridly violative of the Jury Trial Rights set out in the US and North Carolina Constitutions.

2. In reality the International Paper Corp's New York Unit and the International Paper Company's Tennessee Main Headquarters are sued on Diversity of Citizenship. New York State is as well sued on diversity as are the other Defendants. I am certain that both Judge Boyle and Magistrate Webb are very well aware that International Paper operates many mills and is a very large land owner in North Carolina. These Judges ignoring the facts of Diversity of Actions must be complete raising " Minimum Contacts " rules for International Paper's Ticonderoga , New York Operations Unit borders on Fraud. International Paper's Ticonderoga New York Operations and their World Headquarters In Tennessee are the Real Parties in Interest. Each all and every matter complained of in this case occurred at Lake George, New York. International Paper's North Carolina Holdings have ZERO, Nothing, Notta to do in any way with the matters that happened in New York State.

IV.

<u>Frivolity Review equals Court Stripping</u>

1. The use of the assertions regarding and suggestive connotation of " Frivolity Review" distract from the reality that the REQUIRED STANDARDS of proper consideration of Plaintiff's Complaints and Pleadings under FRCP 8 has been ignored by Both Judges at the District Court level. The ABSURDLY and WILDLY Inaccurate Characterization of the Facts as Very Well Pled by this Appellant reveals a Cavalier and Reckless disregard for the Equal Protection and Due Process Guaranteed to Plaintiff and his Parents An Honorable WW II Pacific Carrier Pilot and His Wife a WW II Nurse and Their Family. These Judges can't even give an accurate recount of the factual nature of the case .... BUT they employ sophistries to Dismiss the Pro Se Complaint even knowing FULL WELL that International Paper is a Huge Player in North Carolina Politics and a very very very wealthy Corporation with Operations In North Carolina. Such sophistries and ignoring of well established PUBLIC KNOWLEDGE in Raleigh, North Carolina reveals something much more SINISTER is at work here. The Lower Court's Ticonderoga Bar quip and the Nonsense about "Chunks of Ice" Being Dumped into Lake George by the Court Below TOTALLY Ignore a pattern of REPEATED artificial Manipulations of the IMMMENSE ICE SHEET covered in SNOW Pled By Appellant that occurred repeatedly on Lake George . The entire ice sheet covering the Large Adirondack Lake was repeatedly Wildly Fluctuated up and down and up and down by the International Paper Company and New York State destroying the Witham Family Marina year after year. The ice sheet manipulations were intentional by International Paper and New York Department of Environmental Conservation.

*Note To US Government ..... Place more than 40 Square Miles of 18 inch think Lake Ice on the roof of any Federal Court House and that Court House Would Be CRUSHED Flat and Destroyed. Maybe 100s of Millions of Tons of Lake Ice Placed on the Raleigh Federal Court House would be a good way to Alert The Lower Court to the Seriousness of Appellant's Well Pled Facts that are more than sufficient and Allowed by FRCP 8. Again Appellant never mentioned CHUNKS of Ice Being Dumped into Lake George ..... Maybe The Lower Court Thinks Slipshod Innaccurate and Slothful recitation and CHANGING the Facts of a Case is a good way to CHEAT and STRIP Litigants as done in This Case Is Funny ....*

*Appellant Does NOT <--- <<<*

2. The REALITY of well publicized Legal Cases against International Paper for the VAST DUMPING of Sewage, Paper Sludge and Chemicals into Lake Champlain ( NOT LAKE GEORGE ) were argued and TAPE RECORDED In The US Supreme Court in 1974. The tape of the US Supreme Court Arguments reveal some very, very, very, very SLOPPY and Inartful and Grossly Inadequate treatment of the FRCP 8 Pleadings in this case by the District Court Below.

3. The Sophistries and Disregard employed to make Irrelevant what was done to this Plaintiff's Parents and Family reveals a Corruption and Invidious Discriminatory Animus towards Pro Se Plaintiffs and simply is UNACCEPTABLE. Frankly the treatment of this case by these Judges is abundantly revealing that the Plaintiff's Pleadings were NOT given proper consideration AND The Court Below has engaged in UnAmerican Activity to Strip from Your Appellant His Constitutional and HUMAN RIGHTS to a Jury Trial. The District Court's Actions are a Constitutional and Human Rights Violation of and by themselves.

4. The Universal Declaration of Human Rights to which the United States is a Signatory of the International Human and Legal Rights embodied therein and The US Constitution guarantee and mandate Equal Protection and Due Process of the Law. the Ashcroft vs Iqbal 129 S.Ct. 1937, 1949 (2009 ) and Bell Atl. Corp v. Twombley 550 U.S. 544, 570 ( 2007 ) Plausible Standards Just Recently Adopted are a COURT STRIPPING and Very Illegal Tactic to Eviscerate and Nullify Traditional Due Process and Equal Protection Rights under the Federal and State Constitutions. The Ability to STEAL and Nullify Individuals Constitutional Rights has been the result of the EVIL embodied in the two cases Just Recently Adopted by the Federal Courts. The International Human Rights and Traditional Constitutional Rights of Americans have been RAPED by the Invidious Wicked and Evil stripping of Jury Trials from Americans as a result. Jury Trials are the Constitutional Standard NOT John Ashcroft's Treason to Traditional Jury Trial Rights.

IV.

Diversity of Citizenship

1. Complete Diversity of Citizenship with International Paper and all other litigants is properly stated by Your Appellant per 28 U. S. C. §1332

International Paper's primarily domicile and " Nerve Center " Their Main Corporate Office & Headquarters is in Tennessee at Not North Carolina

6400 Poplar Avenue Memphis TN 38197

International Paper corporate phone number

(901) 419-9000

2. International Paper Company is well known to both Judge Webb and Judge Boyle that caused the Damages In This Case Operate at Ticonderoga, NY on Lake George, The LaChute River and at Lake Champlain. The Unit that is at the center of this case operates in New York, NOT North Carolina ( See Diversity of Citizenship ) Danjaq, S.A. v. Pathe Comm'ns Corp., 979 F.2d 772 (9th Cir. 1992. International Paper the Parent Corp is Headquartered and incorporated in Tennessee NOT New York and Not in North Carolina.

3. On February 23, 2010, the United States Supreme Court unanimously held in Hertz Corp. v. Friend that a corporation's principal place of business is presumed to be the place of the corporation's "nerve center" from where its officers conduct the corporation's important business. Numerous Circuits have since followed this rule, applying the "nerve center" test for corporations with "far-flung" business activities. See, e.g., Topp v. Compair Inc. , 814 F. 2d 830, 834 (CA1 1987); see also 15 J. Moore et al., Moore's Federal Practice §102.54[2], p. 102–112.1 (3d ed. 2009) (hereinafter Moore's).

4. 28 U. S. C. §1332(c)(1) requires three sets of considerations, must be taken together. First, the statute's language supports the approach. The statute's text deems a corporation a citizen of the "State where it has its principal place of business. " 28 U. S. C. §1332(c)(1). The word "place" is in the singular, not the plural. The word "principal" re-quires us to pick out the "main, prominent" or "leading" place. 12 Oxford English Dictionary 495 (2d ed. 1989) (def. (A)(I)(2)). Cf.Commissioner v. Soliman , 506 U. S. 168, 174 (1993) (interpreting "principal place of business" for tax purposes to require an assessment of

"whether any one business location is the 'most important, consequential, or influential' one"). And the fact that the word "place" follows the words "State where" means that the "place" is a place within a State. It is not the State itself.

5. A corporation's "nerve center," usually its main headquarters, is a single place. The public often (though not always) considers it the corporation's main place of business. And it is a place within a State. By contrast, the application of a more general business activities test has led some courts, as in the present case, to look, not at a particular place within a State, but incorrectly at the State itself, measuring the total amount of business activities that the corporation conducts there and determining whether they are "significantly larger" than in the next-ranking State. 297 Fed. Appx. 690. See HERTZ CORP. v. FRIEND - Legal Information Institute

www.law.cornell.edu/supct/html/08-1107.ZS.html

HERTZ v . FRIEND et al. certiorari to the United States Court of appeals for the ninth circuit... sued petitioner Hertz Corporation in a California state court for claimed ...

• HERTZ CORP. v. FRIEND certiorari to the united states court of appeals for the ninth circuit No. 08–1107. Argued November 10, 2009—Decided February 23, 2010

www.law.cornell.edu/supremecourt/text/08-1107

6. Appellant Witham's assertion of Diversity being complete with International Paper is Correct . Plaintiff is suing the Main Offices and Headquarters as Well as the New York State Plant .... <u>North Carolina Was NEVER INVOLED.</u>
http://www.supremecourt.gov/opinions/09pdf/08-1107.pdf

7. The Village of Ticonderoga and New York State, The LaChute Hydo Electric Company and the Dam Operators International Paper Company the Owners and Operators of the Dam all have complete diversity of Citizenship with Appellant Witham. The Court has Jurisdiction over all these Defendants as a matter of Fact and as a Matter of Law.

This Federal Court as well has Jurisdiction as follows ....

8. Supplemental jurisdiction is the authority of United States federal courts to hear additional claims substantially related to the original claim even though the court would lack the subject-matter jurisdiction to hear the additional claims independently. 28 U.S.C. § 1367 is a codification of the Supreme Court's rulings on ancillary jurisdiction (Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365 (1978)) and pendent jurisdiction (United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966)) and a superseding of the Court's treatment of

pendent party jurisdiction (Finley v. United States, 490 U.S. 545 (1989)).

9.      By default, courts have supplemental jurisdiction over "all other claims that are so related . . . that they form part of the same case or controversy" (§ 1367(a)).    The true test being that the new claim "arises from the same set of operative facts."    This means a federal court hearing a federal claim can also hear substantially related state law claims, thereby encouraging efficiency by only having one trial at the federal level rather than one trial in federal court and another in state court. However, if the case is brought as a diversity action (i.e., the basis for federal jurisdiction is that each defendant comes from a state different than each plaintiff), there generally is no supplemental jurisdiction if such claims would destroy complete diversity. See Exxon Mobil Corp. v. Allapattah Services, Inc. Courts are also free to decline to exercise supplemental jurisdiction in specified or exceptional circumstances (§ 1367(c)).

10.      Pendent jurisdiction is the authority of a United States federal court to hear a closely related state law claim against a party already facing a federal claim, described by the Supreme Court as "jurisdiction over nonfederal claims between parties litigating other matters properly before the court."[1] Such jurisdiction is granted to encourage both "economy in litigation",[2] and fairness by eliminating the need for a separate federal and state trial hearing essentially the same facts yet potentially reaching opposite conclusions.

11.      Pendent jurisdiction refers to the court's authority to adjudicate claims it could not otherwise hear. The related concept of pendent party jurisdiction by contrast is the court's authority to adjudicate claims against a party not otherwise under the court's jurisdiction because the claim arises from the same nucleus of facts as another claim properly before the court.

12.      The leading case on pendent jurisdiction is United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966). Gibbs has been read to require that (1) there must be a federal claim (whether from the Constitution, federal statute, or treaty) and (2) the non-federal claim arises "from a common nucleus of operative fact" such that a plaintiff "would ordinarily be expected to try them in one judicial proceeding."

13.      The holding in Gibbs has been essentially codified by Congress along with ancillary jurisdiction in 28 U.S.C. § 1367, its supplemental jurisdiction statute. However, Subsection § 1367 (c)(3) expressly authorizes the district judge to dismiss a supplemental claim when the federal claims have dropped out of the case. [3]

14.      Ancillary jurisdiction is a form of supplemental jurisdiction that allows a United States federal court to hear non-federal claims sufficiently logically dependent on a federal "anchor

claim" (i.e., a federal claim serving as the basis for supplemental jurisdiction), despite that such courts would otherwise lack jurisdiction over such claims. Ancillary jurisdiction differs from pendent jurisdiction in that pendent jurisdiction requires the federal and non-federal claims to arise from a "common nucleus of operative fact," (per "United Mine Workers of America v. Gibbs") not to be logically interdependent. Like pendent jurisdiction, a federal court can exercise ancillary jurisdiction if the anchor claim has original federal jurisdiction either through federal-question jurisdiction or diversity jurisdiction.

15. Areas where ancillary jurisdiction can be asserted include counterclaims (Fed. R. Civ. P. 13), cross-claims (Fed. R. Civ. P. 13),impleader (Fed. R. Civ. P. 14), interpleader (Fed. R. Civ. P. 22) and interventions (Fed. R. Civ. P. 24). Impleader claims are a paradigmatic example of ancillary jurisdiction, given the tendency of such claims to arise under state contract law, but be entirely dependent on the original claim.

"Moore v. New York Cotton Exchange" and "Owen Equipment & Erection Co. v. Kroger" are seminal cases relating to ancillary jurisdiction.

Ancillary jurisdiction has been replaced entirely by supplemental jurisdiction, per 28 U.S.C. § 1367(b), part of the U.S. supplemental jurisdiction statute.

16. In the instant case and as made abundantly clear by Plaintiff Witham the " Minimum Contacts Rule " is wholly irrelevant International Paper's primarily domicile and " Nerve Center " Their Main Corporate Office & Headquarters is in Tennessee at

6400 Poplar Avenue Memphis TN 38197

International Paper corporate phone number

(901) 419-9000

V.

<u>No Chunks of Ice, Sludge or Chemicals Dumped into Lake George</u>

1. The Tape Recorded session of the US Supreme Court in 1974 reveals the Vermont State Attorney General, all the US Supreme Court Justices and Staff and many many many others are Material Witnesses to the Flushing or Dumping of Sludge and Chemicals via the LaChute River into Lake Champlain. The US Supreme Court can be heard at <u>http://www.oyez.org/cases/1970-1979/1971/1971_50_orig</u> See 417 U.S. 270

https://bulk.resource.org/courts.gov/c/US/417/417.US.270.50.html

1. VERMONT v. NEW YORK, 406 - FindLaw | Cases and Codes

http://caselaw.lp.findlaw.com/cgi-bin/getcase.pl?court=US&vol=406&invol=186

VERMONT v. NEW YORK, 406 U.S. 186 (1972). 406 U.S. ... New York and International Paper Co. are given until June 19, 1972, to answer the bill of complaint.

http://www.adirondacklifemag.com/blogs/2013/03/13/one-hundred-years-of-paper-work/

- History of Law Suits and Fines International Paper Ticonderoga

www.lesspollution.org/ip_history.html

1926 - International Paper Co. purchases a pulp mill ... IP refuses to admit that the sludge bed - on the lake ... A quarter million gallons flow into Lake Champlain.

http://link.springer.com/article/10.1007%2FBF02380502

1. Vermont Asks To Sue Ivy., Paper Firm . - Google News

news.google.com/newspapers?nid=2457&dat=19710105...

o International Paper, under deadlines set by the New York state Department of ... per day of pulp and pa per, making waste and untreated domestic or sanitary ... and sludge particles," Vermont said. dissolved oxygen in the Vermont waters has ...

A Full Transcript and Audio of Of The Vast Dumping of Wastes and Chemicals into Lake Champlain .... Chemicals Sewage and Pulp Wastes into Lake Champlain NOT Chunks of Ice.

http://www.oyez.org/cases/1970-1979/1971/1971_50_orig

1. During Winter Months of Ice and Snow Cover The VAST ICE SHEET of Lake George , NY weighing 100s of Millions of Tons was wildly fluctuate by International Paper and the LaChute Hydro Unit as They FLUSHED THEIR GIANT TOILET.

2. The wildly fluctuating Ice Sheet that Covers Lake George , NY Destroyed the Witham Marina ..... The Marina was destroyed several years in a row 1967, 1968, 1969 as the Ice Tore and Shredded and Crushed the Withams Marina. There are absolutely ZERO pleadings by Plaintiff alleging any chunks of ice or anything at all being dumped into Lake George ..... These Facts as falsely interposed in this case by Judge Webb are

completely erroneous and absolutely Irrelevant ..... it would seem that Judge Webb was Rambling and OBVIOUSLY Did NOT properly or accurately recount the well pled facts by Plaintiff Witham. The inept and improper interpretation of Witham's FRCP 8 Case is Unlawful see Haines v. Kerner, 404 U.S. 520 (1971).

3. FRCP 8a has been fully complied with .... "The Notice Pleading Standards" and the Plausible Standards Have Abundantly been complied with by Plaintiff.

4. foremost "there are NO heightened pleading requirements" with regard to 42 USC Sec 1983 lawsuits filed against public officials or employees. Currier v. Doran 242 F.3d 905, 911-917 (10 th Cir 2001) see also Swierkiewicz v. Sorema, N.A. U.S. 506, 122 S.Ct 992 , 152 L.Ed. 2d 1 (2002) "These Courts held that Federal Rule 8 (a) notice Pleading Standards were sufficient."

*Note To US Government ..... Place more than 40 Square Miles of 18 inch think Lake Ice on the roof of any Federal Court House and that Court House Would Be CRUSHED Flat and Destroyed. Maybe 100s of Millions of Tons of Lake Ice Placed on the Raleigh Federal Court House would be a good way to Alert The Lower Court to the Seriousness of Appellant's Well Pled Facts that are more than sufficient and Allowed by FRCP 8. Again Appellant never mentioned CHUNKS of Ice Being Dumped into Lake George ..... Maybe The Lower Court Thinks Slipshod Inaccurate and Slothful recitation and CHANGING the Facts of a Case is a good way to CHEAT and STRIP Litigants as done in This Case Is Funny .... Appellant Does NOT <---*
<<<

VI.

<u>Millions of Tons of Ice</u>

1. The devastating effects caused by intentionally raising and lowering millions of tons of ice on Lake George by these defendants International Paper, New York State Et Al caused catastrophic damages to the Family's Marina and enormous stress emotional trauma and financial damages casuing Mr. Clifford B. Witham II (US NAV AIRCORP WW II ) to suffer a Massive Heart Attack and He Died. Appellant's Mother suffered homelessness with Her Family and She as well severe stress and emotional and financial injuries which ruined the rest of Her life. The consequential effects of the loss of the Family Home was a severe hardship on the whole Family. <u>These FACTS are NOT Irrelevant and to characterize Plaintiff's Pleadings and Rambling and Irrelevant is Highly Objectionable and Offensive.</u>

2. Nothing was dumped into a Ticonderoga Bar as claimed by the Court Below and simply stated the Natural Resources , 600 acre Marina, the Family Home and Business suffered enormous damages that are in excess of $200 Million. NO CHUNKS Of Ice Are Mentioned. Judge Webb's opinions and Frivolity Review was based on erroneous facts that were never pled. Said falsity of Judge Webb's citings reveal He Made Them Up and in a Rambling Fashion falsely interposed them for the actual pleadings. To claim said mischaracterizations are irrelevant is simply untrue and very frankly insulting.

3. Diversity is complete and citing the Minimum Contacts Rule is Irrelevant.

4. The Ascroft Plausibility standard is a Red Herring and Absolutely wholly inapplicable as to this case.

VII.

The Myth of State Sovereignty

All Defendants are Responsible for Negligent and Intentional Acts

<u>The Common Law Of It</u>

1. Judge Webb below completely mischaracterizes the FACTS of this case. The Skewing of the FACTS and SMEARING of Plaintiff's Pleadings amounts to Court Stripping <u>and Throttling.</u> Witham has pled facts and details far in excess of the requirements of Federal Rule 8 known as the Notice Pleading Rules. The intentional and wanton manipulation of Lake George Water Levels durung the dead of Winter while the Lake is covered in Millions of tons of ice and snow to secretively dump vast amounts of sewage, mill wastes, effluent and chemicals into Lake Champlain ( which caused enormous damages to the Witham Marina ) is actionable.

2. The subsequent damages inflicted to the Witham's caused them to lose there Home, Their Business and everything associated with it. <u>At this initial stage of pleading this case is absolutely premature to be immediately dismissing it.</u> At this early stage of these proceedings, it was premature to dispose of the case in this manner. <u>Cf. Street v. Fair, 918 F.2d 269, 272</u> (1st Cir.1990). Plaintiff has NOT been permitted any discovery at all. *As the famed fictional English barrister Horace Rumpole might say: <u>"I'm afraid what we have here is a case of premature adjudication."</u>* JOHN MORTIMER,RUMPOLE MISBEHAVES 176–77 (2007).

2. The basic requirement for pleading a Civil Rights Complaint is found in Rule 8(a)(2) of the Federal Rules of Civil Procedure, kept pleading requirements to a minimum: a valid complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Note that the word "facts" does not appear in this formulation as one of the elements that shows that the pleader is entitled to relief. The broad language of Rule 8(a)(2) worked to the plaintiff's advantage in the once-canonical Conley decision which made it clear that defendants faced an uphill battle to

get a case dismissed just after the complaint had been filed. FED.R.CIV.P. 8(a)(2), 355 U.S. 41 (1957). See generally 5WRIGHT & MILLER, supra note 3, §§ 1215–1218 (discussing the pleading requirements of Rule 8); Walter Wheeler Cook, Statements of Fact in Pleading Under the Codes, 21 COLUM. L. REV. 416 (1921) (noting that there is no logical distinction between categories such as "statements of fact" and "conclusions of law"); Miller, supra note 32, at 1082–93 (describing the conceptual and practical difficulties inherent in the law-fact distinction); Subrin, supra note 1, at 963, 975–77 (describing how the Federal Rules of Civil Procedure avoided the factual and cause of action requirements of civil codes).

3. In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. See, e.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) ("[I]mposing the Court of Appeals' heightened pleading standard in employment discrimination cases conflicts with Federal Rule of Civil Procedure 8(a)(2) . . . ."); Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993) (regarding a § 1983 civil rights dispute seeking municipal liability) ("We think that it is impossible to square the 'heightened pleading standard' applied by the Fifth Circuit in this case with the liberal system of 'notice pleading' set up by the Federal Rules."). Except as otherwise expressly provided by an Act of Congress or by an amendment to the Federal Rules of Civil Procedure which takes effect after the date of enactment of this Act, a Federal court shall not dismiss a complaint under rule 12(b)(6) or (e) of the Federal Rules of Civil Procedure, except under the standards set forth by the Supreme Court of the United States in Conley v. Gibson, 355 U.S. 41 (1957). See S. 1504, 111th Cong. § 2 (2009)

4. For discussion, see, for example, Robert G. Bone, Twombly, Pleading Rules, and the Regulation of Court Access, 94 IOWA L. REV. 873 (2009); Z.W. Julius Chen, Note, Following the Leader: Twombly, Pleading Standards, and Procedural Uniformity, 108 COLUM. L. REV. 1431 (2008) (urging states whose law of civil procedure is patterned on the Federal Rules not to deviate from Conley solely in the interest of uniformity) Civil rights cases are covered under Rule 8(a) and do not require heightened level of pleading – See Leatherman v. Tarrant County. The conduct International Paper, The Village of Ticonderoga with New York State Department of Environmental Conservation and the Lake George Commission resulted in devastation to the Witham's Property Interests in Their Home and livelyhood. The resulting deprivation and damages to their Property falls under US 42 1983, and the provisions of the UDHR.

5. Witham has abundantly given notice to the Defendants and this Court regarding the facts and even some evidence and witness accounts of the reality of How and When the destruction of the Witham's Home and Marina entail. Dismissal of this case at this initial stage of pleading is simply improper. Fed Rule 8 (a) 2 does not call for a probability showing nor "detailed factual allegations" or require the pleading of evidence. Fortunately, they merely require "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]. See Adam Steinman, The Pleading Problem, 62 STAN. L. REV. 1293 (2010), and see also Dobyns v. U.S., 91 Fed. Cl.

412 (2010). What may be feasible or sufficient plausible allegations and facts under the Twombly and Iqbal standards is offered in Edward A. Hartnett, Taming Twombly, Even After Iqbal, 158U.PA.L.REV. 473 (2010)., supra note 53, at 1328–33 (noting that Twombly and Iqbal commonly are "misread " to require evidentiary support at the pleadings stage) *emphasis added*

6. According to the Supreme Court in Conley v. Gibson, pleadings only needed to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests" to survive a motion to dismiss. Fact revelation and issue formulation should occur later in the pretrial process. "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." Conley, 355 U.S. at 48. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) ("This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims."). In seeking summary judgment, the movant always has "the burden of showing the absence of a genuine issue as to any material fact." Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). Cases generally narrowed in scope as they approached trial. See 4 WRIGHT & MILLER, supra note 3, § 1029 (3d ed. 2002) (discussing the purpose and construction of the Federal Rules of Civil Procedure).

7. Perhaps the case that best represents the access-minded and merit-oriented ethos at the heart of the original Federal Rules is Dioguardi v. Durning. As many may remember from their law school civil procedure course, John Dioguardi, an immigrant and pro se plaintiff, asserted various grievances against the Collector of Customs of the Port of New York. His home-drawn complaint alleged in broken English a number of factual circumstances but failed to make any coherent legal presentation. Judge Charles E. Clark, the principal draftsman of the Federal Rules, wrote for the Second Circuit in overturning the district court's Rule 12(b)(6) dismissal of Dioguardi's action.17 The court found enough information within the complaint's allegations to satisfy Rule 8(a)(2)'s pleading standard. Judge Clark's opinion reminded the profession that Rule 8 required only "a short and plain statement of the claim showing that the pleader is entitled to relief" and no longer demanded "facts sufficient to constitute a cause of action," as was required under code pleading. Judge Clark's lecture on the new pleading standard was confirmed thirteen years later by the Supreme Court's ruling in Conley v. Gibson, in which it famously stated, "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim . . . ." Dioguardi v. Durning, 139 F.2d 774 (2d Cir. 1944). See generally 5 WRIGHT & MILLER, § 1220 (showing how Dioguardi is illustrative of the pleading philosophy created by the Federal Rules of Civil Procedure). see also Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970) (holding that it was error to grant summary judgment because the respondent did not meet its "burden of showing the absence of a genuine issue as to any material fact").

8. The standard required to be applied to the legal sufficiency of the Pro Se Civil Rights / Human Rights complaint—whether any legally cognizable wrong has been stated—not the quality of its notice-giving content. The former is a Rule 12(b)(6) function; the latter should be addressed under Rule 12(e). See Leimer v. State Mut. Life Assurance Co., 108 F.2d 302, 305–06 (8th Cir. 1940). For numerous cases illustrating the liberal and simplified pleading regime under Conley, see 5WRIGHT &MILLER, supra note 3, §§ 1202, 1215–1218.

9. See Erickson v. Pardus, 551 U.S. 89 (2007), three weeks after Twombly, , see A. Benjamin Spencer, Understanding Pleading Doctrine, 108 MICH.L.REV. 1, 6–9 (2009); see also Dottolo v. Byrne Dairy, Inc., No. 5:08-CV-0390 (GTS/ATB), 2010 WL 2560551, at *4 (N.D.N.Y. June 22, 2010) (stating that Erickson was merely an application of the statement in Twombly that ***a pleading does not need to set out in detail the facts upon which a claim is based***). emphasis added.

9. The Newly created Twombly Standards of Plausibilty Pleading requiring Facts to be determined by Judges was Never Intended to Court Strip a Plaintiff of the right to have a Jury Decide The Facts of a Case. The standards applicable to Civil Rights, Property and Human Rights cases do NOT allow any Court to usurp a Plaintiff's or a Defendants right to Have The Jury " The Constitutional Fact Finders" hear a case by Court Stripping a Litigant based on Plausible Deniability Of Rights commonly known as Throttling A Litigant. See See generally A. Benjamin Spencer, Iqbal and the Slide Toward Restrictive Procedure, 14 LEWIS & CLARK L. REV. 185, 196–97 (2010) (noting that Iqbal clearly challenged the principle that a plaintiff's allegations are assumed to be true). Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009). See generally 5WRIGHT &MILLER,supra note 3, §§ 1215–1218 (discussing the pleading requirements of Rule 8); Walter Wheeler Cook, Statements of Fact in Pleading Under the Codes, 21 COLUM. L. REV. 416 (1921) (noting that there is no logical distinction between categories such as "statements of fact" and "conclusions of law"); Miller, supra note 32, at 1082–93 (describing the conceptual and practical difficulties inherent in the law-fact distinction); Subrin, supra note 1, at 963, 975–77 (describing how the Federal Rules of Civil Procedure avoided the factual and cause of action requirements of civil codes).

10. Factual and therefore potentially jury triable facts are improperly being left up to Law Clerks and Judges to decide including the key allegations in Iqbal itself. It is now fairly common for federal courts to channel words used in Iqbal and characterize allegations as merely "formulaic," "conclusory," "speculative," "cryptic," "generalized," or "bare." By transforming arguably factual allegations into legal conclusions and refusing to draw favorable inferences from them—thereby ignoring portions of the complaint—judges are both failing to construe the complaint in favor of the pleader as prior Rule 12(b)(6) doctrine required and performing functions previously thought more appropriate for the factfinder. And they are doing so based only on the complaint. This concern and the ramifications of it are strikingly demonstrated in Dan M. Kahan, David A. Hoffman & Donald Braman, Whose Eyes Are You Going to Believe? Scott v. Harrisand the Perils of Cognitive Illiberalism, 122 HARV. L. REV. 837 (2009). Professor Suja Thomas discussed a similar principle. See Suja A. Thomas, The Fallacy of Dispositive Procedure, 50 B.C.L. REV. 759, 760–61 (2009)(asserting that judges

dismiss cases based on their own views of the facts). Examples may be Marrero-Gutierrez v. Molina, 491 F.3d 1, 9–10 (1st Cir. 2007), where the First Circuit upheld the discharge of a government worker allegedly based on political activity, and Adams v. Lafayette College, No. 09-3008, 2009 WL 2777312, at *4 (E.D. Pa. Aug. 31, 2009), where the Eastern District of Pennsylvania upheld an employment discipline measure allegedly based on age. With a few exceptions, the application of facts to legal principles historically has been left to the jury. See generally James B. Thayer, Law and Fact in Jury Trials, 4HARV.L.REV. 147, 170 (1890)(describing the jury's role in weighing facts). See generally Hoffman, supra note 106, at 1259–60 (detailing the disparities in summary judgment filing and grant rates across court and case types)

11. There are NO Heightened Pleading Standards for Pro Se Civil Rights Litigants under Rule 8 (a) 2 to treat Civil and Human Rights litigants as such denies to them discovery and an opportunity to prove Their cases. See, e.g., R.R. Co. v. Stout, 84 U.S. (17 Wall.) 657, 664 (1873) (Story, J.) ("It is assumed that twelve men know more of the common affairs of life than does one man, that they can draw wiser and safer conclusions from admitted facts thus occurring than can a single judge."). For an expression of concerns along these lines, see <u>In re Travel Agent Comm'n Antitrust Litig.,</u> 583 F.3d 896, 912 (6th Cir. 2009) (Merritt, J., dissenting).

12. The Seventh Circuit took a restrained view of Twombly and Iqbal in Swanson v. Citibank, N.A., a case alleging racial discrimination in connection with the denial of a housing loan. In her majority opinion, Judge Diane P. Wood remarked, <u>Swanson v. Citibank, N.A</u>., No. 10-1122, 2010 WL 2977297 (7th Cir. July 30, 2010).

"Plausibility" . . . does not imply that the district court should decide whose version to believe, or which version is more likely than not. . . . As we understand it, the Court is saying instead that the plaintiff must give enough details . . . to present a story that holds together. . . . [C]ould these things have happened, not did they happen.

See ..... Under Federal Rule of Civil Procedure 8(a)(2): Toward a Structured Approach to Federal Pleading Practice, 243 F.R.D. 604 (2006). <u>None of the hundreds of pre-Twombly cases cited in</u> 5 WRIGHT & MILLER,supra note 3, §§ 1202, 1215–1219, <u>place any emphasis on "showing."</u>

13. As early as 1947, the Supreme Court recognized the central role access to discovery under the Federal Rules plays in achieving the objectives of the American civil justice system when it penned the line: "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Fifty years later, Court of Appeals Judge Patrick E. Higginbotham echoed that philosophical principle:

*Congress has elected to use the private suit, private attorneys general as an enforcing mechanism for the anti-trust laws, the securities laws, environmental laws, civil rights and more. In the main, the plaintiff in these suits must discover his evidence from the defendant. Calibration of discovery is calibration of the level of enforcement of the social policy set by Congress.*

*See generally Has the Supreme Court Limited Americans' Access to Courts ?: Hearing Before the S. Comm. on the Judiciary, supra note 41, at 256–69 (statement of John Payton, President, NAACP Legal Defense and Educational Fund) (cautioning about the adverse effect of the heightened pleading standard on civil rights cases); Access to Justice Denied: Ashcroft v. Iqbal: Hearing Before the Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the H. Comm. on the Judiciary, supra note 53, at 79–92 (statement of Depo P. Adegbile, Director of Litigation, NAACP Legal Defense and Education Fund) (noting the detrimental impact of Twombly and Iqbal in both civil rights cases and more generally in all cases); Bone, supra note 99, at 876 (noting the potential problems posed by the new pleading standard for civil rights cases); Schneider, supra note 44 (arguing that the heightened pleading standard will result in an increase in dismissals for civil rights cases).*

*See .... Hickman v. Taylor, 329 U.S. 495, 507 (1947). Patrick E. Higginbotham, Foreword, 49ALA.L.REV. 1, 4–5 (1997).*

*14. Rule 8(a)(1) requires "a short and plain statement of the grounds for the court's jurisdiction"; Rule 8(a)(3) only calls for "a demand for the relief sought." Witham has pled abundant facts showing How the Intentional Lake Manipulations caused the damage and injuries in this case and how and why the Defendants are Culpable and Responsible.*

*15. Before any dismissal should be allowed Thorough Discovery Should be permitted. Witham has NOT been allowed any time to do any discovery even though His Pleadings Abumdantly meet the Plausibility Threshold. Associate Professor of Law, The Catholic University of America Columbus School of Law) (suggesting that courts should "be open, upon receipt of a Rule 12(b)(6) motion, to allowing plaintiffs some initial discovery focused on those discrete facts necessary to show a plausible claim" and that such limited discovery has been used in determining whether the requirements for class actions, qualified immunity, and jurisdiction have been met); see also Edward A. Hartnett, Taming Twombly, Even After Iqbal, 158 U. PA. L. REV. 473, 507–14 (2010) (noting that, except in cases of qualified immunity, district courts have broad discretion to allow discovery prior to a Rule 12(b)(6) decision); Suzette M. Malveaux, Front Loading and Heavy Lifting: How Pre-Dismissal Discovery Can Address the Detrimental Effect of Iqbal on Civil Rights Cases, 14 LEWIS & CLARK L.REV. 65, 69 (2010) (noting that courts should permit limited "plausibility discovery" in civil rights cases upon receipt of a Rule 12(b)(6) motion).*

*16. Witham's Pleading are abundantly clear and factual NOT conclusionary in any way. FED. R. CIV. P. 12(e) ("A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired."). The motion is available only when "a pleading . . . is so vague or ambiguous that the . . . [movant] cannot reasonably prepare a response." Id. See generally 5C WRIGHT & MILLER,supra note 3, §§ 1374–1379 (discussing the elements of a motion for a more definite statement under Rule 12). In the instant case .... Witham's Facts are Plead in an Abundantly Sufficient Fashion ... Showing The Circumstances, The Effects of the Defendants Actions*

*and all requisites of Jurisdiction and Venue. The Court's factual determinations are simply inaccurate ESPECIALLY regarding anything being dumped into Lake George such as Chunks of Ice emphasis added*

*17. Witham's Pleadings are Abundantly Sufficient .... , moreover pleadings by pro se plaintiffs are to be construed liberally. See Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) (per curiam) ("A document filed pro se is 'to be liberally construed'" (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976))); see also Granda v. Schulman, No. 09-12564, 2010 WL 1337716, at *4 (11th Cir. Apr. 7, 2010) (construing the complaint liberally because the plaintiff was acting pro se, even though the complaint did not allege whether the defendant was acting under color of state law for a § 1983 claim); Cann v. Hayman, 346 F. App'x 822, 824 (3d Cir. 2009) (noting the principle that pleadings of pro se litigants are liberally construed).*

VIII.

Witham's Opposition to Violations of the Universal Declaration of Human Rights.

States are NOT Immune from suits for Unconstitutional Destruction or Taking of Property.

The Court's Improper Premature 12 b 6 / Rule 56 Summary Judgement

1. Currently the United States Government Department of Justice Attorney General Eric Holder and Justice Department attorneys are arguing before the Supreme Court Bond vs the United States see http://www.law.cornell.edu/supct/cert/12-158 , The US Government's position is that a law that abides by an international treaty adopted by the U.S. would allow the federal government to prosecute a case that would otherwise be handled by state or local authorities. The case in question Bond v. United States, where a woman allegedly used chemical agents for revenge against a woman with whom her husband had an affair. While the use of a weapon would normally fall under the state's jurisdiction to prosecute, the federal government has gotten involved and seeks to undermine state sovereignty by claiming that the woman is in violation of the Chemical Weapons Convention Implementation Act, the international agreement that Syrian dictator Bashar Assad has been accused of violating. While the woman's actions may be heinous, the DOJ's position, is that the federal government in a position to use international treaties to prosecute American citizens.

2. The United States is a Signatory to the Universal Declaration of Human Rights ... see http://www.law.cornell.edu/wex/human_rights

3. The Inter-American Commission on Human Rights, for example, ensures

that signatories of the American Convention on Human Rights abide by that treaty.

4. The law of human rights is therefore an international body of law of treaties and decisions from international tribunals, although many individual states may have also enacted domestic laws that protect what are traditionally thought of as human rights.

5. The United States is an example of a country that is both party to international agreements and has enacted its own human rights guarantees. The Constitution of the United States guarantees basic freedoms, such as equal protection under the laws, to all United States citizens (Amendment XIV). Additionally, the United States has passed legislation further protecting the human rights of its citizens.    A good example is civil rights legislation    (Title 42, Chapter 21 of the U.S. Code).    The United States is also bound by treaty obligations. It has ratified the four Geneva Conventions of 1949, is a member of the United Nations, and has signed and/or ratified other human rights agreements.

6. Additionally The United States is a Signatory to The International Covenant on Civil and Political Rights (ICCPR), which establishes universal standards for the protection of basic civil and political liberties, is one of three documents that comprise the "International Bill of Rights."  See   http://internationalbillofrights.org/

7. In 1966, the ICCPR was adopted by the United Nations, but no action was taken by this country to ratify it until October 1977, at which time I signed the Covenant and submitted it to the Senate for advice and consent as required by our Constitution. The Senate gave this consent in April 1992, and in early June, George Bush signed the instrument of ratification. On June 8, 1992, the US, one of the key players in drafting the Covenant, finally ratified this important human rights treaty.

8. The International Covenant on Civil and Political Rights (ICCPR) is a multilateral treaty adopted by the United Nations General Assembly on 16 December 1966, and in force from 23 March 1976. It commits its parties to respect the civil and political rights of individuals, including the right to life, freedom of religion, freedom of speech, freedom of assembly, electoral rights and rights to due process and a fair trial. As of May 2013, the Covenant had 74 signatories and 167 parties.

9. The ICCPR is part of the International Bill of Human Rights, along with the International Covenant on Economic, Social and Cultural Rights (ICESCR) and the Universal Declaration of Human Rights (UDHR).    The United States Senate ratified the ICCPR in 1992

10.   International Paper, Ticonderoga and the State of New York are NOT cloaked with Immunity for the Unconstitutional and Unlawful intentional manipulation of the vast Ice Sheet that covers Lake George New York in the Winter.   Using the Lake Level of lake George in like

fashion as a GIANT TOILET RESERVIOR to flush vast amounts of Sewage, Pulp Wastes, Chemicals and Toxins into Lake Champlain, secretly, caused serious manipulation / fluctuation of the 100s of Millions of Tons of Ice and Snow Covering Lake George New York.

11. The ICCPR is monitored by the United Nations Human Rights Committee (a separate body to the United Nations Human Rights Council )

## Fact One.

A. State and Federal Government Actors are NOT cloaked with Immunity in this case. The International Paper Company and it's Agents and Contractors certainly are NOT Immune nor are the Officials and Agents of the Village of Ticonderoga, The Lake George Commission, Warran County or the State of New York. See ... Bivens v Six Unknown Named Agents, 304 US 388 (1971), Monroe v Pape, 365 US 167 (1961), Doe v McMillan, 412 U.S. 306 (1972), Pulliam v Allen, 456 U.S. 522 (l984), See the Universal Declaration on Human Rights as well as the International Bill of Rights.

B. Our courts have extended partial immunity for “official and necessary acts” to sheriffs, Doe v McFaul, 599 F.Sup. l42l (N.D. Ohio l984); prosecutors Imbler v Pachtman, 424 U.S. 409 (l976); coroners, Lambert v Garlo, l9 Ohio App 3rd 295, 484 NE2d 260 (l985); court reporters, Brown v Charles, 309 F.Sup. 8l7 (E.D. Wis. l970); clerks of the court, Wiggins v New Mexico State Supreme Court Clerk, 664 F2d 8l2 (l0th Cir. l98l); jurors, White v Hegerhorst, 4l8 F2d 894 (9th Cir. l969); grand jurors, Turpen v Booth, 56 Cal. 65 (l880); witnesses, Briscoe v LaHue, 460 U.S. 325 (l983); bailiffs, Wolf v Flanagan, No. l4746 (Ohio Ct. App. Oct. 2, l980); and arbitrators, Hill v Aro Corp., 263 F.Sup. 324 (N.D. Ohio l967). But the Court has, more often than not, been extremely circumscribed in granting judicial immunity. Indeed, Chief Justice Marshall in the famous Marbury v Madison, 1 Cranch 137 (1803) made it quite clear:

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws when he receives an injury. " 1 Cranch 137 at 163 (1803).

Indeed, not even the Sergeant-at-Arms of the United States Congress' House of Representatives has been granted immunity. In Kilbourn v Thompson, 103 US 168 (1881):

"the Sergeant-at-Arms of the House of Representatives arrested the plaintiff under a warrant issued by the House. Plaintiff refused to testify in a congressional investigation and the House issued a contempt citation against him. The court held that the House did not have jurisdiction to conduct the particular investigation. The Sergeant at Arms, therefore, was liable for false arrest and could not assert the issuance of the warrant as a defense. "

C. In Nixon v Herndon, 273 US 536 (1927) the Court held that state officials would be personally liable in damages for denying plaintiff his right to vote by enforcing a racially discriminatory election law. In Monroe v Pape, 365 US 167 (1961) the Supreme Court held that police officers may be held liable under section 1983 for infringing upon the constitutional rights of others even when their

actions are not shown to be willful. In Bivens v Six Unknown Named Agents, 304 US 388 (1971) the Court held that in the absence of a federal statutory remedy for unconstitutional searches, the Constitution itself provides for a damage action against the offending federal officers.

D.    Even the Superintendent of Public Documents and the Public Printer for Congress could not sustain an immunity claim when republishing a libel as the Court in Doe v McMillan, 412 U.S. 306 (1972) reasoned, republishing a libel is not an essential part of the legislative process.

E.    Calling the partial immunity granted to many of these officials "qualified immunity", the Court extended common law immunity for "reasonable" acts in "good faith". When lower courts became confused as to whether qualified immunity involved a subjective or objective inquiry, the Court explained in Wood v Strickland , 420 U.S. 328, 95 S. Ct. 992 (1975) that the qualified immunity analysis necessarily contains both objective and subjective elements. The analysis is subjective, said the Court in that the defendant official, to receive protection, must have acted "with a belief that he [was] doing right." Wood, 420 U.S. at 321. The analysis is objective, the Court reasoned, in that officials could not receive protection where they ignorantly believed their actions to be appropriate when in fact their actions violated "settled" and "indisputable" law.

D.    As citizens and their counsel began to utilize 42 USC § 1983 actions to redress grievances, the Court began to articulate its sense of the statute:

"The purpose of the statute was to deter public officials from using the badge of their authority to violate persons' constitutional rights and to provide compensation and other relief to victims of constitutional deprivations when that deterrence failed." Carey v Piphus, 435 US 247, 253 (1978)

E.    In Gomez v Toledo, 446 U.S. 635 (1979) the Court spoke to the concern among plaintiffs that they had an impossible burden to meet by showing in their pleadings that the acts of the defendants were both unreasonable and in bad faith. The Court offered that "Nothing in the language or legislative history of Sec. 1983, however, suggests that in an action brought against a public official..... a plaintiff must allege bad faith in order to state a claim for relief." Gomez at 640. The Court went on to instruct:

"Since qualified immunity is a defense, the burden of pleading it rests with the defendant.    See Fed. Rule Civ. Proc. 8c (defendant must plead any "matter constituting an avoidance of affirmative defense")" Id. The Court went on to quote from Wood v Strickland and instructed:

"The applicable test focuses not only on whether the official has an objectively reasonable basis for that belief, but also on whether "[t]he official himself [is] acting sincerely and with a belief that he is doing right". Gomez, 641 The Court informed that:

"The existence of a subjective belief will frequently turn on factors which a plaintiff cannot reasonably be expected to know. For example, the official's belief may be based on state or local law, advice of counsel, administrative practice, or some other factor of which the official alone is aware. To impose the pleading burden on the plaintiff would ignore this elementary fact and be contrary to the

established practice in analogous areas of the law." Gomez, 641

F. In City of Newport v Fact Concerts, Inc., 453 US 247.259 (1981) the Court characterized its process of determining the degree of immunity to which a particular official was entitled as a "careful inquiry into considerations of both history and policy."

The same year City of Newport was decided, the Court faced some of the aftermath of the Nixon administration in Harlow et al v Fitzgerald, 457 U.S. 800. In that case, plaintiff Fitzgerald claimed Bryce Harlow and Alexander Butterfield, two Nixon administration aides, conspired to have him discharged from his position with the Air Force. H.R. Halderman, John Ehrlichman, Ronald Zeigler and Richard Nixon were all heard on the infamous Nixon tapes, discussing Fitzgerald's demise. In their concurrence Mr. Justice Brennan wrote for himself and Justices Marshall and Blackmun and said: "I agree with the substantive standard announced by the Court today, imposing liability when a public-official defendant "knew or should have known" of the constitutionally violative effect of his actions.... *This standard would not allow the official who actually knows that he was violating the law to escape liability for his actions, even if he could not "reasonably have been expected" to know what he actually did know.......Thus the clever and unusually well-informed violator of constitutional rights will not evade just punishment for his crimes."*

Harlow et al v Fitzgerald, 457 U.S. 800, 820-821 (1981) emphasis in original, citations omitted

G. The Harlow Court reasoned that qualified or "good faith" immunity is an affirmative defense that must be plead by a defendant official. Gomez v Toledo, 446 U.S. 635 (1980). The Court cited to Wood v Strickland, 420 U.S. 308, 322 (1975) and offered: "Decisions of this Court have established that the "good faith" defense has both an "objective" and a "subjective" aspect. The objective element involves a presumptive knowledge of and respect for "basic unquestioned constitutional rights." Harlow et al v Fitzgerald, 457 U.S. 800 (1981)

H. Several years later, the Court took up the case of Billy Glover. Mr. Glover, a pro se litigant, sued Bruce Tower the Douglas County, Oregon Public Defender and a number of others from his prison cell. Billy alleged that Tower and other conspired to secure a conviction in violation of his constitutional rights. The Federal District Court threw his case out, but the Court of Appeals reversed and the Supreme Court granted certiorai. The Court reasoned: "We do not have a license to establish immunities from Sec. 1983 actions in the interests of what we judge to be sound public policy. It is for Congress to determine whether Sec. 1983 litigation has become too burdensome to state or federal institutions and, if so, what remedial action is appropriate." Tower v Glover, 104 S. Ct. 2820, 2826 (1984) That being said, the Court reviewed its immunity decisions and the history of the Civil Rights Act of 1871 [also known as the Klu Klux Klan Act]. Quoting from Imbler v Pachtman, 424 US 409 at 421 (1976), the Court noted that § 1983 immunities are "predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." If an official was accorded immunity from tort actions at common law when the Civil Rights Act was enacted in 1871, the Court offered that it next considers whether Civil Rights Act history or purposes

nonetheless counsel against recognizing the same immunity in § 1983 actions. In Tower, the Court concluded: "Using this framework we conclude that public defenders have no immunity from § 1983 liability for intentional misconduct of the type alleged here. "Tower v Glover, 104 S. Ct. 2820, 2825 (1984). The following year the Court took up more of the Nixon administration backwash in Mitchell v Forsyth, 472 U.S. 511(1985) and reasoned: "The danger that high federal officials will disregard constitutional rights in their zeal to protect the national security is sufficiently real to counsel against affording such officials an absolute immunity." Mitchell at 523.

I. Two years later, the Federal Court of Appeals for the Ninth Circuit reviewed the Supreme Court's partial immunity decisions and reasoned: "In spite of the benefits of immunity for certain decision makers, the balance might not be struck in favor of absolute immunity were it not for the presence of safeguards build into the judicial process that tend to reduce the need for private damage action." Meyers v Contra Costa Cy. Dep't of Social Servs., 812 F2d 1154, 1158 (9th Cir. 1987). The following year, the Eleventh Circuit took up Goddard v Urrea, 847 F2d 765 (11th Cir. 1988). In Goddard the plaintiff brought a civil suit claiming that the defendants, agents of the Bureau of Alcohol, Tobacco and Firearms, had conducted an unlawful search and seizure of her property. The defendants filed a motion for summary judgment, claiming qualified immunity. The district court denied the motion and the defendants appealed. The Eleventh Circuit held that the denial of summary judgment for qualified immunity was justified because genuine issues of fact remained, which would impact upon a finding of good faith or reasonableness. The same year, the Sixth Circuit rejected a plea to dismiss because of "qualified immunity" and declared it an "affirmative defense" which the defendant had to plead and prove. Duncan v Peck, 844 F2d 1261 (1988).

J. A year after Duncan, the Sixth Circuit took up the claims of James and Grace Achterhof. Their cause of action against social worker Anthony Selvaggio and his Department of Social Services had been dismissed when the District Court ruled that the defendants were entitled to "absolute immunity" for their actions in "opening a case" on the Achterhof's children and placing Mr. Achterhof's name on a central registry of child abusers even after their investigation found no credible evidence of abuse. The Sixth Circuit reversed reasoning that because of the sweep of absolute immunity, and reluctance of the Supreme Court to extend "absolute" prosecutorial or judicial immunity to anyone but prosecutors and judges, it was inappropriate to extent a prosecutor's or judge's immunity to investigative social workers. Achterhof v Selvaggio, 886 F2d 826, 829 (6th Cir. 1989).

K. The Court made explicit its wish to circumscribe immunity claims recently in Antoine v Beyers & Anderson, Inc. ___ U.S.___, ___ n4, 113 S. Ct. 2167, 2170 ( N4) (1993), saying that the courts have "been quite sparing in [their] recognition of absolute immunity and have refused to extend it any further than its justification would warrant".

L. An agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and the courts will strike it down. See Ex rel. Accardi v. Shaughnessy 347 U.S. 260 [1964] and In Board of Educ. of A.A. Co. v. Barbano 45 Md

App 27    "No man in this country," this court has said, "is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the Government, from the highest to the lowest, are creatures of the law, and are bound to obey it." United States v. Lee 106 U.S. 196, 220.'. Burton v. United States 202 U.S. 344 [1906]. As stated by the highest court in Maryland in Mayor of Baltimore v. Porter 18 Md. 284: "Where a limited tribunal goes beyond its jurisdiction, its decision amounts to nothing and does not create the necessity for an appeal."

M.    Miranda v. Arizona 384 U.S. 436 [1966] `As Mr. Justice Brandeis once observed: "Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our Government is the potent, the omnipotent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious, If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means ... would bring terrible retribution. Against that pernicious doctrine, this Court should resolutely set its face." Olmstead v. United States, 277 U.S. 438, 485 (1928)(dissenting opinion).' (page 479)

N.    No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it. It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives. United States v. Lee 106 U.S. 196, 220

## Fact   Two.

A.    The United States   (all of them   are   United )   are a Signatory to the Universal Declaration on Human Rights.    State and Federal Government Actors and Private Corporations acting in Concert with State or Federal Actors are subject to the Proscriptions Set Out in the UDHR.    Governments and Corporations in the United States ARE NOT Cloaked with Immunity for Criminal or Tortuous Actions that Throttle or Strip Americans negligently, intentionally or criminally of Property or Civil Liberties, Equal Protection or the Due Process of Law.    The International Bill of Rights Also Applies.    The International Bill of Rights (IBOR) is a set of enforceable human rights that all people in all countries are entitled to as human beings. The United States is a Signatory to IBOR and as such IBOR is enforceable in the courts of all countries that have agreed to the international agreement. http://www.ohchr.org/Documents/Publications/Amnesties_en.pdf

B.    As the International Court of Justice has emphasized in the context of a foreign minister's offi cial immunity, the immunity from jurisdiction enjoyed by incumbent Ministers for Foreign Affairs does not mean that they enjoy impunity in respect of any crimes they might have committed, irrespective of their gravity.    Immunity from criminal jurisdiction and individual criminal responsibility are quite

separate concepts. [...] Jurisdictional immunity may well bar prosecution for a certain period or for certain offences; it cannot exonerate the person to whom it applies from all criminal responsibility.

1. The UDHR Clearly Stands For The Following Maxims.

Whereas recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world,

2. Whereas the peoples of the United Nations have in the Charter reaffirmed their faith in fundamental human rights, in the dignity and worth of the human person and in the equal rights of men and women and have determined to promote social progress and better standards of life in larger freedom,

3. Article 1.

All human beings are born free and equal in dignity and rights. They are endowed with reason and conscience and should act towards one another in a spirit of brotherhood.

4. Article 7.

All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration and against any incitement to such discrimination.

5. Article 10.

Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him.

6. Article 17.

(1) Everyone has the right to own property alone as well as in association with others.

## (2) No one shall be arbitrarily deprived of his property.

Nore ..... Equal Rights, Due Process and Property Protections which are the Essence of this International Declaration and Human Rights Treaty and Laws. All of the United States and the United States are Bound to Uphold the UDHR

## Fact Three.

No one shall be arbitrarily deprived of his property. ... UDHR Article 17, 2 (Schabas 1991). Article 17 of the UDHR states:

1. Everyone has the right to own property alone as well as in association with others.

2. No one shall be arbitrarily deprived of his property.

A. The Officers and Agents of International Paper Company and The Village of Ticonderoga and the State of New York these defendants over a period of 100 Years or so Dumped MORE THAN 1500 Acres in some places 20 feet deep of Raw Sewage and Toxic Chemicals into the La Chute River. They along with New York State and the Village of Ticonderoga RELEASED vast amounts of water from Lake George .... Down the LaChute River and by so doing FLUSHED vast amounts of Raw Sewage and Pulp Wastes and Chemicals into Lake Champlain. This VAST Toxic Mess STILL LAYS ON THE BOTTOM of Lake Champlain ( Not Lake George ). The actions of these State Actors and the Private Corporation caused Vast Property Damage, Criminal Acts of Negligence at Best, These Intentional Acts resulted in CATASTROPHIC Damage to the Witham Family Marina. The actions of these Defendants was secreted and done in the dead of Night and During the Dead of Winter " UNDER THE COVER" of vast Sheets of Ice and Snow to Conceal and Secret The Criminally Negligent and Tortuous Conduct. These State and Private Actors and Agents are NOT Immune in any way shape or form from Suit for Damages or Declaratory Judgments and Damages.

B. The Amnesty Act 2001 adopted in the Solomon Islands

includes a provision that, on its face, is comprehensive in excluding international human rights violations and war crimes. After defining conduct subject to amnesty, the law provides: “The amnesty or immunity referred to in this section does not apply to any criminal acts done in violation of international humanitarian laws, human rights violations or abuses....”

C. Property as an Intrinsic Right

The right to own property may be more than a strategic human right; it may also be an intrinsic human right, necessary to the preservation of human dignity. In its Preamble, the UDHR roots all human rights in human dignity in the famous phrase, "Whereas recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, peace and justice in the world." At one point in the discussion of the right to private property, the drafters of the UDHR voted to adopt a version that explicitly linked it with dignity: "Everyone has the right to own such property as meets the essential needs of decent living, that helps to maintain the dignity of the individual and of the home, and shall not be arbitrarily deprived of it" (Morsink 1999, 145). The American Declaration of the Rights and Duties of Man notes the relevance of property to human dignity in its Article 23, which states "Every person has a right to own such private property as meets the essential needs of decent living and helps to maintain the dignity of the individual and of the home."

C. As discussed above, property ownership is Protected un the 4th, 5th and 14th Amendment of the United States Constitution. These Rights are Protected under the NY Constitution as well as the US Constitution and the UDHR

## Fact Four.

A. The Water Releases were intentionally done during Winter ( Ice and Snow Cover ) The vast purposeful release of water From Lake George To Lake Champlain was used to FLUSH the materials and diffuse them widely in Lake Champlain ( Not Lake George ) The Agents and Actors employed by , under contract or acting for the Private Corporate Interests and the Village and State Actors INTENTIONAL CONDUCT is NOT Entitled to Absolute Immunity. These acts directly caused the destruction of the Witham's Business inflicting devastation upon the Family's income resulting in a loss of all they owned.

## Fact Five.

A. The promise of the Universal Declaration of Human Rights:

Prior to the World War II, there was a "gentleman's agreement" among nations. Each federal government was free to grant human rights to, or withhold human rights from, their own citizens with impunity. Other nations simply looked the other way. Individuals only received those freedoms that their own governments decided to grant them.

By the late 1940's, the world had recently recoiled in horror at some of the horrendous human rights abuses of World War II, including:

... Extermination of 6 million Jews, 400,000 Roma, and millions of others during the Nazi Holocaust.

... Indiscriminate bombing of civilians by both sides.

... Grossly inhumane treatment of prisoners of war and women forced into sexual slavery by the Japanese Army.

B. On December 10, 1948, in an atmosphere of hope for the future, the General Assembly of the United Nations adopted and proclaimed the Universal Declaration of Human Rights (UDHR). 1,2

The preamble to the UDHR contains many noble sounding phrases:

"...the inherent dignity and of the equal and inalienable rights of all members of the human family..."

"...human beings shall enjoy freedom of speech and belief and freedom from fear..."

"...the dignity and worth of the human person and...the equal rights of men and women..."

The 30 articles of the UDHR continue with such impressive statements as:

"Article 1: All human beings are born free and equal in dignity and rights."

"Article 3: Everyone has the right to life, liberty and security of person."

"Article 5: No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."

"Article 9: No one shall be subjected to arbitrary arrest, detention or exile."

No one shall be arbitrarily deprived of his property. UDHR Article 17, 2 (Schabas 1991). Article 17 of the UDHR states:

1. Everyone has the right to own property alone as well as in association with others.

2. No one shall be arbitrarily deprived of his property.

## The gradual realization of the goals of the Universal Declaration of Human Rights:

The 50th anniversary of the UDHR has passed. "Beyond the pious speeches and manufactured celebrations, something quite marvelous is happening: the birth of a global human-rights culture." 3 As of mid-2000, there have been two major developments:

.... The detention of Agusto Pinochet, the aging former dictator of Chile for gross human rights abuses. He has been accused of responsibility for mass torture and genocide, starting in the late 1970's.

.... The arrest and transfer of Slobodan Milosevic, ex-dictator of the former Yugoslavia, by the United Nations war crimes tribunal. He was indicted on 1999-MAY-24 for war crimes and crimes against humanity committed by Yugoslav and Serbian troops...in Kosovo in early 1999. According to Human Rights Watch, "The crimes include the slaughter of hundreds of ethnic Albanians, forcible deportations of hundreds of thousands of people, and persecution based on racial, religious, and political identification." More recently there have been "discoveries of mass graves of Kosovo Albanians, near Belgrade and in other parts of Serbia..." 16

..... Human Rights Watch noted that "the surrender of Milosevic makes clear that no leader accused of crimes against humanity is beyond the reach of international justice." 16

..... Various hearings established two very important principles:

..... One country can lay charges involving torture, even if the acts were committed in another country.

## <u>Even heads of states have no immunity from prosecution</u>.

This revolution can be seen in many ways:

..... Various groups are now attempting to bring to trial those leaders who have allegedly violated human rights on a massive scale. In early 2000, this included:

..... Augusto Pinochet, former dictator of Chile.

..... Military officers, primarily members of the Serbian Orthodox Church, who led or authorized genocidal massacres in Bosnia in the mid 1990s.

..... Jean-Claud "Baby Doc" Duvalier for extensive atrocities in Haiti which started in the 1960's.

..... Hissein Habre, former dictator of Chad for "97 political killings, 142 instances of torture, 100 disappearances, 736 arbitrary arrests" by the Documentation and Security Directorate (DDS). He has been charged in Senegal, where he has been living since his ouster in 1990. 14

..... "These cases are a shot across the bow of tyrants everywhere. No longer can they expect impunity for their crimes and a cozy retirement in the south of France."

**<u>Heads of state</u> and of armies will realize that <u>they no longer have immunity against prosecution for their crimes against humanity.</u>**

***Ticonderoga, The State of New York, International Paper and their Actors, Agents and Contractors ARE NOT Entitled to Immunity In This Case. <u>Witham's Family Has Property, Due Process and Equal</u>***

***Protection Rights under Domestic Constitutional and International Law.* US 42 1983 - 1985 applies see 4th 5th and 14th Amendments US Constitution.**

E. Human rights is a priority item on the agendas of most visits by leaders of democratic countries to dictatorships. The world's largest dictatorship, China, even hosted a human rights conference recently.

F. There are now 6 human rights bodies in Geneva Switzerland which monitor and attempt to protect social, cultural, political, and civil rights as well as the use of torture, racial discrimination, genocide, children's rights and women's rights. In theory, any person whose government has ratified the accords that created these international bodies can charge their own government with wrongdoing. In practice, there are many roadblocks that prevent individuals from taking advantage of this right. A review sponsored by the Ford Foundation and led by Anne Bayefsky of York University in Toronto, Canada and Christ of Heyns of the University of Pretoria in South Africa may result in change in this area.4

G. Kofi A. Annan, United Nations Secretary-General has repeatedly stated that state sovereignty must not shield states in the face of crimes against humanity. This has come to be known as the "Annan Doctrine," According to Human Rights Watch: "During the wave of post-referendum violence in East Timor in the fall of 1999, he warned that senior Indonesian officials risked prosecution for crimes against humanity if they did not consent to the deployment of an available multinational force. They quickly relented."

H. New York State, The Village of Ticonderoga, The United States and Certainly International Paper are NOT Entitled to Immunity See US Const. 4th, 5th, 14th Amendment and US 42 1983 , 42 USC 1985. The Vast Destruction of their Marina by these Defendants does NOT entitled to Immunity .

Fact 6.

A. Lake Geogre Basin is more than 40 Square Miles. A Winter Ice sheet of that size covered with Snow weighs hundreds of millions of Tons. By intentionally dumping Lake George Water into the LaChute River during Winter Ice Cover ... Intentionally Lowering the Lake George Ice Sheet DESTROYED the Witham Marina. The weight of the Frozen Lake being Dumped and then Raised and then Dumped again ( TWICE in 1969 ) Decimated the Witham Family Marina. The Vast Weight of the Frozen Ice being Lowered and raised and lowered and raised again DESTROYED the Marina. International Paper and the Lake George Commission have since 1969 ADMITTED the Lake

Lowering and the Lake Raising. The Vast Pulp and Sewage Dumping has as well been PUBLICALLY Recorded in the Records of the State of Vermont, New York State's Records and those of The US Supreme Court. Plaintiff Witham left New York many, many, many Years ago .... Only recently has He aquired the factual basis upin which He has discovered what International Paper and the other defedants did intentionally.

***329,204,474 Tons Of Frozen Lake Ice and Snow were intentionally lowered and Raised ad Lowered Again just in the Winter of 1968 / 1969 It Destroyed The Witham Family Marina. The criminal dumping of the infectous and toxic wastes were secreted by doung it Under The Ice Sheet during Dead of Winter concealing it from Public View.***

***B. Lake Champlain as a Result of the stated intentional poisoning of the Lake .... on am ongoing and Continuing Daily Basis ( a Continuing Offense) creates a serious continuing nuisance and threat to Public Health Saftey and Welfare. Statutes of Limitations are renewed every day the Offense***



*Continues.*

## Fact 7.

A.      This case is in the earliest stages of Pleading.    At this time to treat Witham's Pleadings and subject them to the rigors of a Rule 56 Summary Judgment or like a Rule 12b 6    Dismissal is simply unconscionable.    The essential facts of the Culpable Parties, The Damages they have Inflicted, The enormous financial losses Your Defendant and His Family have incurred and the fact that International, The State of New York and Ticonderoga, The Lake George Commission have recently and Publically Admitted their INTENTIONAL ACTS does NOT warrant a Summary Dismissal.      Plaintiff Witham    Left New York State in the Early 1970s after the Death of His Brother and Father.    Only Recently has Witham ascertained enough facts to cause His Filing of This Action.    The Plaintiff's HID their Conduct for Years.      See    Witham Tolling of Statutes of Repose Brief ....    Repeated Here Ad Hoc Verbatim.

8.      This case is simply NOT subject to a Summary Dismissal under 12 B 6    and the    Defendants Have    NOT    Filed a Motion for a Rule 56 Summary Judgment.

## Fact 8.

Witham is NOT Rambling ...

All are entitled to equal protection by law without any discrimination (Article 7 UDHR).

"All persons shall be equal before the courts and tribunals" (Article 14-1 ICCPR).

"Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal

charge against him" (Article 10 UDHR).

Everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law (Article 14-1 ICCPR).     See US    Const. 4th, 5th and 14th Amendments    and    USC 42    1983 - 1985.    Plaintiff Witham left New York many, many, many Years ago .... Only recently has He acquired the factual basis upon which He has discovered what International Paper    and the other defendants did intentionally.

## Fact 9.

A.     International Paper, Ticonderoga, The Lake George Commission and The State of New York ARE NOT IMMUNE.     Falsely and Inaccurately attacking Witham's Pleadings or    FABRICATING and Improper Immunity for these Defendants based on    The    SMEARING and Unwarranted Disparagement    of Witham's Pleadings,    is an act of Court Stripping or the Throttling of a Pro Se Litigant.    Such Throttling or Court Stripping Is Unconstitutional ( Denial f Due Process and Equal protection of the Laws)    and Violates the UDHR     Witham    NEVER alleges Chemicals and Ice Chunks beig Dumped into Lake George    That FALSEHOOD is    Obvious and    ABSURD.

## Fact 10.

A.     Witham has properly Plead and Actionable Cause pursuant to Federal Rule of Civil Procedure 8. The Claim that the Pleadings are Rambling    are a    Vague and Bald Naked Demurrer and factually void of specifics.    The Smearing of Witham's Allegations with the    Rambling Connotation is ABSOLUTELY UNWARRANTED.

## Fact 11.

A.     Using General Demurrers and Falsities and Twisted and Untruthful Court Actions to DEPRIVE    Witham of Due Process and Equal Protection of the Laws    IS    A HUMAN RIGHTS VIOLATION as well as a Violation of the US and North Carolina Constitution.     Witham has a Civil Right to Due Process and Equal Protection of the Laws.    The    International Treaty On Human Rights    Applies in This Case.

1.    All are entitled to equal protection by law without any discrimination (Article 7 UDHR).

2.    "All persons shall be equal before the courts and tribunals" (Article 14-1 ICCPR).

3.    "Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him" (Article 10 UDHR).

4.    Everyone shall be entitled to a fair and public hearing by a competent, independent and

impartial tribunal established by law (Article 14-1 ICCPR).

5. The Withams are entitled to compensation and damages for the destruction of the Family Marina.

## Fact 12.

See US Constitution 4, 5th and 14th Amendment also USC 42 1983 - 1985 . Intentionally Lowering a 40 Square Mile Ice Sheet Covered in Vast Amounts of Snow during the dead of Winter by Opening Flood Gates at Ticonderoga's Dam Operated by International Paper and the State of New York placed Millions of Tons of Ice Upon the Witham Family Marina. This Flushing Operation Caused the Ice Sheet to CRUSH the Witham Marina. The Actions of Ticonderoga, International Paper and the State of New York were INTENTIONAL. Witham's Facts couldn"t be clearer or better pled. Characterizing them as Rambling is REDICULOUS.

SEE The Picture Graphs Attached.

Toxic Sludge Sewage and Chemicals Flushed into Lake Champlain

The Sludge Bed Stretches from Fort Ticonderoga to Crown Point, NY

## Fact 13. The Myth of State Sovereign Immunity.

A. Apart and Separate from the Legal Principles, Maxims and Directives cited in the US Constitution, Equal Protection and Due Process Decisions above stated and the OBVIOUS provisions of The Universal Declaration on Human Rights and International Protection of Due Process, Equal Prtection and Property Rights .... The 11th Amendment Simply Does NOT afford New York State, International Paper, The Village of Ticonderoga or anyone else Immunity under the 11th Amendment. The UDHR is clear on Property and Legal/Civil or Human Rights.

B. It might be true, as Justice Holmes famously suggested, that the "life of the law" is experience, not logic. But a little logic now and then is still a good thing. The logic of state sovereignty is unmistakable. If states are not sovereign, then there is no logical reason that the federal government should be prohibited from exercising fully its enumerated powers, even if the exercise of those powers interferes with the operations or policies adopted by certain states. If states are sovereign, on the other hand, then the Court has been far too accommodating of federal government policies that intrude into state prerogatives. These two options are mutually exclusive; the Court cannot continue to try having it both ways by denying states true sovereignty—i.e., exclusive, final, and enforceable power over matters within clearly defined sovereign domains—while simultaneously granting states the authority to fend off unwanted federal encroachments under ambiguous rules that defy clear explanation and sometimes (see, for example, the morass of Eleventh Amendment law) common sense.

C. There would be little downside to an outright recognition that states lost their sovereignty with the adoption of the Constitution. States operating within a federal system defined by a single national sovereign would not be able to use the courts to thwart unwanted federal policies, but neither would the states go out of existence or lose effective control over policy matters that are truly local in nature. The parochial and mundane nature of most local issues insulates the states from federal interference for the simple reason that there is little to merit the attention of ambitious politicians who populate the policymaking institutions of the national government. Grabbing control over issues that general consensus dictates are largely local in nature is not the way to advance a national political career.

D. In contrast, granting states true sovereignty would finally require the courts to define the parameters of that sovereignty—a task the Court so badly bungled in National League of Cities that even those who defended the general theory of National League (see Justice Powell's dissent in Garcia, for example) sheepishly gave up the effort to defend thatdecision's actual holding. The only thing worse than a situation defined by the open-ended quasi-sovereignty advanced by the likes of Justice Powell would be a situation in which the Court actually did define the specific boundaries of the new state sovereigns, which would then be the catalyst for a Yugoslavian-style battle among parochial sovereign entities that have the same primary objective as every other true sovereign: i.e., dominance of neighboring sovereigns. Why embracing the myth of state sovereignty makes sense as political theory in the modern age is a question that the Court has not yet answered, nor, in its haste to evade acknowledging the extreme implications of its actions, even seen fit to address ..... See Generally

**http://moritzlaw.osu.edu/students/groups/oslj/files/2012/03/63.6.gey_.pdf**

**E. Article III's provisions extending the federal judicial power "to Controversies between a State and Citizens of another State"** See **Chisholm v. Georgia**, 2 U.S. (2 Dall.) 419 (1793), **Seminole Tribe of Florida v. Florida**, 517 U.S. 44 (1996), **Cohens v. Virginia**, 19 U.S. (6 Wheat.) 264 (1821), **Hans v. State of Louisiana**, 134 U.S. 1 (1890), **Atascadero State Hospital v. Scanlon**, 473 U.S. 234 (1985) and **Alden v. Maine**, 527 U.S. 706 (1999)

F. Article III, § 2 as Codified 28 U.S.C. § 1332. (1) citizens of different States; Provides Diversity Jurisdiction as International Paper is Incorporated at International Paper, International Paper Company 865 Pittsburgh Drive - Delaware, OH43015-2860 The Village of Ticonderoga New York, The International Paper, (World Headquarters Memphis Tennessee ) and Warren County, NY and Warren County, NY and the lake George Commission are distinctly Citizens of a Foreign States. The State's Agents and The Village of Ticonderoga's Employees and Actors are YET TO BE Fully Identified. All the Governmental Perpetrators live or work in New, York. The Corporate Defendants reside in Tennessee at International paper's World Headquarters or in Ohio where International Paper is Incorporated. Diversity of Citizenship is Complete and Abundantly clear.

**G. The actions of the Defendants in this case were concealed and secreted for many years after their actions directly caused the Injuries and Damages set forth herein. International Paper, The Village of Ticonderona, New York State were many years AFTER Plaintiff Witham left New York State shown to have Flushed Massive Amounts of Industrial Wastes, Bio-Wastes, Chemicals of all Kinds, PCBs, Dioxins, Mercurie, Lignin and Phenols and Combinations of all types of Raw Human Effluents and Chemicals into Lake Champlain. These Defendants RECENT Public Statements do NOT Negate the conduct complained of herein was SECRETED for many Years. Witham just recently became aware of sufficient facts to determine He Lawfully Possessed Sufficient Evidence for this cause of Action. Plaintiff Witham left New York many, many, many Years ago .... Only recently has He acquired the factual basis upon which He has discovered what International Paper and the other defendants did intentionally.**

**Respectfully Submitted,**

Judson Witham

**Judson Witham**

**15215 Aiken**

**Wake Forest, NC 27587**

**Proof Of Service and Notice To Defendants**

This is to Certify that these Defendants have on this the 2nd Jan Day of 2014 Have Been Served and Noticed by First Class US Mail Certified Return Receipt Requested as follows.

International Paper Company Has Been Served and Noticed at It's Plant Headquarters at

568 Shore-Airport Road Ticonderoga, NY 12883

(518) 585-5300

Judson Witham

and at

**Office of the President**

**International Paper Global Headquarters**

**6400 Poplar Avenue**

**Memphis, TN 38197**

The Town Of Ticonderoga NY has been Served and Noticed at

Town of Ticonderoga Community Building

132 Montcalm Street, PO Box 471

Ticonderoga, NY

518.585.6677

The State of New York, New York State Department of Environmental Conservation and New York State's Lake George Commission and Warren County, NY have been Served and Noticed at

**Eric Schneiderman New York State Attorney General**

**State Capitol Bldg, Albany, NY**

(518) 474-5481